## Combs v. Combs.

Jan. 29, 1946.

464

J. J. Tye for appellant.

H. H. Owens for appellee.

Opinion of the Court by Judge Dawson—Affirming.

This is an action for divorce, alimony, and the custody and maintenance of an infant child who at the present time is five years of age.

The parties, who shall be referred to herein as plaintiff and defendant, were married in Rockhold, Kentucky, in 1932, and lived in Whitesburg until 1937, when they moved to Barbourville where they lived until March 1941. At that time the defendant secured a position as sales manager for a wholesale soft drink concern at Whitesburg and moved his family back there. He retained this position and continued to live in Whitesburg until June 1942, when he became a special investigator of personnel for a firm of cost engineers at Kingsport, Tennessee. The family moved to Kingsport where they lived in a furnished apartment until June 1944, at which time the defendant was employed as an accountant by one of the war plants at Oak Ridge, Tennessee, at a salary of approximately $300 per month. They rented one of the government houses at Oak Ridge and furnished it with their own furniture. They lived there together with their small son until April 8, 1945.

On that date, which was Sunday, the defendant left early in the morning for a fishing trip to Norris Lake. Plaintiff's sister, Ruby Hollifield, was visiting at the Combs home at this time. During the day the plaintiff and her sister, apparently without any warning, left Oak Ridge and returned to the plaintiff's family's home in Barbourville. On the following day, Monday, April 9, 1945, plaintiff filed this action, charging the defendant with cruelty and habitually drinking to excess. She asked for $5000 alimony and $40 per month for the

support of the child, in addition to an absolute divorce and custody of the child.

Upon submission of the case the court gave judgment to the plaintiff for an absolute divorce, the custody of the child, $50 per month for the support of the child, alimony in the sum of $2500 and $250 as a fee for her attorney.

At the time of their marriage the plaintiff was eighteen years of age and had attended college for one year. The defendant was twenty-four years of age and had graduated from Union College in 1935.

Many witnesses testified in the case and it is necessary to review the testimony of some of them. The plaintiff, in her deposition, which was taken shortly after the action was filed, testified that the defendant drinks to excess and has been doing so for several years; that on Thursday before she left the Oak Ridge home he was drinking heavily, beat her badly, cursed her, accused her of running around with other men, and that it was at this time she made up her mind to leave him. At the time she gave her deposition she was wearing glasses to hide a black eye and bruises which she said were the result of the beating administered her by the defendant on that night. She further testified that practically every day the defendant accused her of seeing other men, when he knew that there was no basis for such accusations; that he called her a whore and a bitch in front of their child; that he told her one of his friends tested her out to see if she was good enough to go with his wife. On the day she returned to Barbourville she arrived on the bus about 4:30 p. m. and that night the defendant called her twelve times and accused her and her sister of leaving with two men.

She further testified that she had once before filed suit for divorce on the same grounds but dismissed it on his promise that he would discontinue his drinking and his abuse of her. She recalled that on one occasion when they had been back home to Barbourville for a visit and were returning to Oak Ridge, he stopped in Middlesboro and got drunk, which compelled her to drive the automobile. She said that while driving up the mountain it was pouring rain and he beat her, but that she was afraid to stop the automobile on the mountain. She did stop in front of the Cumberland Gap hotel

where he made her get out and then pulled her back in the car by her hair in such a manner as to cause her head to be sore for weeks. During this scuffle she got out of the car and he jumped in the car and, taking the baby, left her in front of the hotel. She called two friends in Middlesboro and in their company attempted to find the defendant, but when they were unable to do so the couple took her back to Oak Ridge.

She said that on the night of April 9th, which was the day this action was filed, the defendant came to her family's residence in Barbourville and knocked and kicked at the door, demanding the baby. The door was locked and when they would not let him in he announced that he would "kill every God-damn person in there." Her family was forced to call the police, the sheriff and finally the fire department. She said that he was very drunk and his behavior was such that the sheriff was compelled to arrest him.

She further testified that she is afraid of the defendant, that he is dangerous and that she is a nervous wreck and cries most of the time. She brought nothing home with her except the baby's clothes and $200 in war bonds. She testified that the defendant received $4200 from his father's estate and that he had in excess of $2500 in his pocket when he was arrested by the sheriff which was attached in this action.

Ruby Hollifield, plaintiff's sister, testified that she had visited the Combses at Oak Ridge on two occasions, the last being the Saturday before she and the plaintiff returned to Barbourville for the purpose of filing this action. She confirms the testimony of the plaintiff concerning the telephoning the defendant did on Sunday night and his actions at the family residence on the following night. She further testified that she has been with the couple quite a bit since they were married; that she has seen the defendant drunk many times; that he is cross and mean when he is drinking, is a crazy fool and dangerous, and that she doubts whether the plaintiff could live with him in safety. She also confirms the testimony of the plaintiff about the vulgar names the defendant called the plaintiff in the presence of the child.

George M. Golden, father of the plaintiff, testified that he had seen the defendant drunk a dozen times or

more and that he was very abusive. He confirms the other testimony concerning the defendant's actions at his residence on the Monday night he was arrested.

John Pickard, the sheriff, corroborated the evidence concerning the arrest of the defendant, states that he was intoxicated and that he had considerable difficulty in arresting him.

J. W. Beams, who lives in Barbourville and has been working at Oak Ridge, testified that he had seen the defendant drunk on various occasions.

Johnny Lucas, a family connection, recalls one occasion when the plaintiff called him at night and requested him to come to their apartment; that when he arrived the defendant had torn up most of the furniture and was shouting to the plaintiff that he was going to kill her; that he had to use force in subduing the defendant in order to take plaintiff to her mother's, and that immediately following this, the defendant got drunk again and came to his house with a double barreled shotgun saying that he was going to "kill every God-damn Golden," and had to be driven away by the police. He states that he had him arrested for this but at the request of the plaintiff he withdrew the charges. He further testified that the plaintiff is a woman of good moral character and that she neither smokes nor drinks.

Mrs. Golden, the plaintiff's mother, testified to practically the same facts, and adds that the defendant had taught the baby to drink from little bottles saying it was whiskey and that was the way his daddy did.

Some three other witnesses testified to various facts indicating the truthfulness of plaintiff's testimony.

On the other hand, the defendant testified that he works practically all the time, many times on Sunday; that he has a responsible position as an accountant and would be unable to drink and perform his duties, and that he never did so to excess. He states that he had been an athlete in high school and college and had been trained not to drink and that this was almost a religion with him. He says the first drink of liquor he ever had was given to him by his wife's mother, the next drink by her brother, and the first whiskey he ever purchased in Barbourville was purchased from his wife's grandfather. He states as a positive fact that he has

never at any time drunk to excess; that he does not keep whiskey in his home and never did; he denies in detail every accusation of the plaintiff, particularly the beatings and cursings.

He states that most, if not all of the drinking at the Oak Ridge home was done by his wife's half-brother and that on one occasion he had been compelled to ask his wife to have her brother leave. He testified to his horror of his child seeing any one drink; stated that on the Sundays he was not working he took his family to Sunday school and church; that he has always been a good husband and a good provider. He denied emphatically that he was drunk or drinking on the Monday night he was arrested in Barbourville. He stated that when he returned from the fishing trip and found his wife gone he missed $350 in government bonds and $1100 in cash which he had in a cedar chest. (The plaintiff denies any knowledge of the $1100, and admits taking $200 in government bonds.) He denied that he ever accused his wife of having any sort of relations with other men, and referring again to the Monday night episode in Barbourville stated that he was completely sober and that his father-in-law met him on the porch of his residence with a forty-five, causing his wife to call to him that he had better run because her father was going to kill him.

He testified that several years ago he and his wife had planned another child and one day the plaintiff told him that her mother did not want her to have the child, and over his strenuous objections his mother-in-law took his wife to Cumberland Gap where an abortion was performed, causing his wife to become seriously ill.

Questioned concerning the time he left his wife stranded in Cumberland Gap he explained that he stopped in Middlesboro to pick up a friend who worked at Oak Ridge, that when he went up to the hotel room to get him, his friend was sitting up in bed nude and that when his wife came into the room she did not leave when she saw that the man was in a state of undress. On the way home he reprimanded his wife for her actions and she insisted on getting out of the car and going home with friends of hers.

W. C. Young and Iowa Young, his wife, lived next door to the Combses in Oak Ridge, and both testified

that they have known the Combses about one year; that the defendant was a good husband, never mistreated his wife, never used liquor excessively, was a good provider, and took his family to church and Sunday school when he was not working on Sunday. They testified that the couple seemed very happy, and Mrs. Young says that although she saw the plaintiff every day she never at any time complained of her husband's actions. They both testified that there were never any wild parties or drinking at the Combses residence.

August and Helen Codispoti testified that they had known the couple for years; that they had never known the defendant to drink to excess; that he was always a gentleman and treated his wife as a husband should.

Sam Collins, Harry Brown, and Joe Guarneri, all residents of Oak Ridge, testified as to the gentlemanly characteristics of the defendant, his ability in his position, and stated that they had never seen him under the influence of intoxicants and that he could not have performed his duties as capably as he did if he drank to excess.

In his attempt to reverse the judgment the defendant relies on six grounds:

1. The failure to sustain his special demurrer to the petition as amended.

2. Failure to sustain his general demurrer to the petition as amended.

3. That the court erred in permitting various amendments to the petition.

4. That the court erred in failing to sustain his motion for a continuance.

5. Failure to discharge the attachment.

6. That the evidence does not sustain the judgment.

The complaints will be taken up in order:

1. This seems to be the main point made by the defendant in his effort to overturn the judgment. It is claimed that the Knox Circuit Court did not have jurisdiction of the parties because they had no actual residence in that county. First it is claimed that the original petition failed to state the necessary jurisdictional facts.

This is true. The original petition alleges a residence of only six months whereas a residence of at least one year is required by the statute. However, this defect was cured by the second amended petition. Second, it is claimed that the facts failed to show that the residence of the parties is in Barbourville. With this we can not agree. It is shown by the record that both plaintiff and defendant registered and voted in Barbourville, Knox County, and that the defendant registered in Barbourville for the draft. When they lived at other places they always referred to Barbourville as "home."

The status of these parties as to residence can not be measured by their admittedly temporary absence during the emergency through which this nation has just passed, and it must be kept in mind that the conditions of the terrible war caused its citizens to be summoned from their homes for indefinite periods, and this applies not only to the members of the armed forces but to the employees of the many war plants scattered throughout the nation. These various plants have drawn heavily from the populace of the country and it is understood by all that the absence of persons for the purpose of engaging in war work has been temporary and has never been considered anything else. This is particularly true as to the plant at Oak Ridge where the property was entirely owned by the government and the necessity of secrecy required drastic curtailment of the usual liberties of the people who were employed there.

To hold that anyone employed at that place for as much or even more than a year or two (requiring the establishment of a temporary home) would transfer that person's residence, would be unthinkable. It is entirely clear from the facts in this case that the parties never intended to, nor did, abandon their residence at Barbourville, and we so hold.

2. Again the defendant is correct in saying that the original petition failed to state a cause of action. The petition failed to allege that the charges contained therein were without like fault on the part of the plaintiff and also failed to allege that the grounds set up for divorce occurred in Kentucky and within five years next before the commencement of the action. However, again this defect was cured by the third amended

petition, all these amendments being filed before the demurrers were passed upon.

3. It was within the court's discretion as to whether or not the plaintiff would be allowed to file the various amendments to her petition, and this discretion was not abused in permitting these amendments to be filed.

4. Again it was within the discretion of the court as to whether or not the defendant was entitled to a continuance of the case, and we can not say that such discretion was not exercised properly.

5. There is no merit in the contention that the motion to discharge the attachment should have been sustained. The usual law of attachments does not apply to divorce actions. We feel that the court properly overruled the motion.

6. If we take the plaintiff's testimony to be true, which we do, this case discloses the most brutal, persistent, and studied cruelty that we have had occasion to observe. Instance after instance is recited as examples of the continued physical, verbal and mental assaults upon the body and mind of this wife and mother, and further consideration of this point is unwarranted and unnecessary. We agree with the lower court that it is regrettable that more alimony can not be allowed because of the financial circumstances of the defendant.

As further indication of the character of the defendant, this record shows that during the pendency of this action the plaintiff, at the persuasion of the defendant, permitted him to take their son for a visit to Oak Ridge with the distinct understanding that he would be returned to her at Barbourville in approximately one week. To this day he has not returned the child to its mother, who was awarded its custody by the court, although repeated orders, directing him to do so promptly, have been entered in this case. The defendant has completely ignored these orders and has likewise completely ignored orders fixing punishment for his contempt of the court, which punishments, we have no hesitation in saying, are, if anything, inadequate. We trust that the court will enforce these orders to the fullest extent.

The judgment is affirmed.